**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | |
|---|---|
| NIMA GHARAVI, an individual, and RIGHT CALL OFFICIALS, INC., an Illinois corporation,<br><br>Plaintiffs,<br><br>v.<br><br>JASON BRYANT, an individual, and the NATIONAL WRESTLING MEDIA ASSOCIATION, an unincorporated association,<br><br>Defendants. | Case No. __________<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

## INTRODUCTION

1. This is an action for defamation *per se*, defamation *per quod* in the alternative, and tortious interference with contractual relations and with prospective economic advantage. To remove a competitor, Defendants Jason Bryant and the National Wrestling Media Association ("NWMA") coordinated a campaign of false and defamatory statements targeting Plaintiff Nima Gharavi, a licensed Illinois wrestling official and credentialed wrestling media operator. The campaign also targeted Plaintiff Right Call Officials, Inc. ("RCO"), the business entity through which Gharavi operates the Midwest Wrestle YouTube channel.

2. Bryant was, at all relevant times, President of the NWMA, the primary professional organization for the wrestling media industry in the United States. As Gharavi and RCO recently discovered, Bryant sent private text messages on December 29, 2023 to the Head Wrestling Coach at Northwestern University. Without factual basis and without any investigation, those messages falsely characterized Gharavi as a "perv" whose conduct posed a danger to the wrestling

community. Bryant deliberately concealed his role, avoiding public statements and operating through private back-channel communications. Gharavi could not discover Bryant's role until November 13, 2025, when counsel for a third-party who produced those communications confirmed that the sender—saved in that party's phone only under the pseudonym "Twink"—was Jason Bryant. Bryant's concealment was deliberate, as he hoped to avoid accountability for his actions. As he acknowledged in a private message, he was "extremely cautious with how [he] said things publicly about this topic." Instead, he directed his communications privately to those with the most influence and ability to affect Gharavi and RCO's livelihood.

3. Bryant's and the NWMA's conduct cost Gharavi professional media credentials and officiating contracts with organizations including the Illinois High School Association, the Illinois Elementary School Association, and the National Collegiate Athletic Association. It cost him the business opportunities associated with an approximately eight-year career serving the wrestling community. The campaign Bryant and the NWMA set in motion subjected Gharavi to public threats of physical violence and forced him to temporarily vacate his home for his physical safety after an attempted break-in. It caused severe and lasting harm to his professional reputation, business relationships, and personal wellbeing.

4. Plaintiffs seek compensatory damages, punitive damages, and injunctive relief.

## PARTIES

5. Plaintiff Nima Gharavi is domiciled in the Northern District of Illinois. Prior to moving to Illinois, he served with the Boulder County Sheriff's Office in Colorado, ultimately as a sworn, state-certified law enforcement officer. Gharavi is a licensed Illinois High School Association wrestling official and a credentialed wrestling media operator who has served the wrestling community for approximately eight years. Gharavi is the author and sole copyright

owner of all original video content and photographs created for and published on the Midwest Wrestle YouTube channel. Gharavi is the sole officer and employee of Plaintiff RCO.

6. Plaintiff RCO is an Illinois S-corporation with its principal place of business in the Northern District of Illinois. RCO is the business entity through which Gharavi conducts his officiating and media operations, including the commercial operation of the Midwest Wrestle YouTube channel.

7. Defendant Jason Bryant is an individual domiciled at 2739 17th Street NW, New Brighton, Minnesota 55112. At all relevant times, Bryant served as President of the NWMA. Bryant resigned the NWMA presidency on December 4, 2025.

8. Defendant National Wrestling Media Association is, upon information and belief, an unincorporated membership association with its principal mailing address at P.O. Box 120889, New Brighton, Minnesota 55112. The NWMA is the national professional organization for journalists and media professionals who cover the sport of amateur wrestling. Bryant conducted the defamatory campaign described in this Complaint in his capacity as NWMA President, using the NWMA's institutional authority and resources to distribute defamatory content to athletic directors, wrestling coaches, and media institutions throughout the United States.

**JURISDICTION AND VENUE**

9. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). Gharavi is domiciled in Illinois and is a citizen of Illinois. RCO is incorporated in Illinois and has its principal place of business in Illinois, and is a citizen of Illinois. Bryant is domiciled in Minnesota and is a citizen of Minnesota. The NWMA is an unincorporated association and, for purposes of diversity jurisdiction, is a citizen of each state of which any of its members is a citizen. Bryant, the NWMA's President at all relevant times, is a citizen of

Minnesota. Upon information and belief, the NWMA's other officers during the relevant period are citizens of Iowa, Minnesota, and North Carolina, and no member of the NWMA is a citizen of Illinois. The amount in controversy exceeds $75,000, exclusive of interest and costs.

10. The Court has personal jurisdiction over Bryant pursuant to the Illinois long-arm statute, 735 ILCS 5/2-209, and the Due Process Clause of the Fourteenth Amendment. Although domiciled in Minnesota, Bryant purposefully directed defamatory conduct expressly aimed at Illinois. He sent private text messages to the head wrestling coach of Northwestern University's athletic program in Illinois, characterizing Gharavi—an Illinois resident—as a "perv." He did so with knowledge that the resulting harm would fall primarily on Gharavi's professional life in Illinois. Bryant's messages caused Gharavi's ejection from the 59th Annual Ken Kraft Midlands Championships at NOW Arena in Hoffman Estates, Illinois, and the confiscation of Gharavi's media credential by Northwestern University personnel. They set in motion a defamatory campaign whose effects were concentrated on Gharavi's professional reputation and business relationships in Illinois.

11. The Court has personal jurisdiction over the NWMA pursuant to the Illinois long-arm statute, 735 ILCS 5/2-209, and the Due Process Clause of the Fourteenth Amendment, on the same grounds as Bryant. The NWMA's defamatory campaign was carried out by Bryant in his capacity as NWMA President, using NWMA's institutional authority and resources to direct harm at an Illinois plaintiff through communications with Illinois institutions. The NWMA, acting through its President as its agent, caused Gharavi's ejection from an Illinois event, the loss of media credentials in Illinois, and economic harm concentrated in this district.

12. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred here. Those events include the ejection

and credential confiscation at NOW Arena in Hoffman Estates, Illinois, and the harm suffered by Gharavi and RCO in this district.

## FACTUAL BACKGROUND

### A. Plaintiff Nima Gharavi and Right Call Officials, Inc.

13. For approximately eight years, Nima Gharavi has served the wrestling community in two distinct and complementary professional capacities: as a licensed wrestling official and as the operator of Midwest Wrestle, a YouTube-based wrestling media channel. Midwest Wrestle has grown into one of the most-viewed independent wrestling media properties in the United States.

14. At all relevant times, Gharavi has held credentials with the National Collegiate Athletic Association ("NCAA"), the Illinois High School Association ("IHSA"), the Illinois Elementary School Association ("IESA"), and USA Wrestling ("USAW"). USAW is the national governing body for the sport of wrestling in the United States and an agency within the United States Olympic and Paralympic Committee's network. Gharavi has officiated wrestling matches at all levels of the sport, from youth tournaments to high school and collegiate competitions throughout Illinois and surrounding states.

15. As a media operator, Gharavi established the Midwest Wrestle YouTube channel to provide recorded match footage for use in official referee training clinics. That purpose has continued throughout the channel's operation. Prior to the actions alleged in this Complaint, Gharavi had regularly contributed clips to clinicians and administrators conducting officiating training programs. As the channel grew in reach and recognition within the wrestling community, its audience expanded to include coaches, athletes, and wrestling enthusiasts broadly. The channel publishes full-match recordings of wrestling competitions at which Gharavi has received media credentials or formal authorization from event organizers.

16. Gharavi films wrestling matches using professional-grade equipment, including a high-quality video camera mounted on a professional-grade stabilizing gimbal—the kind of conspicuous, professional apparatus used by credentialed broadcast and media operators at sporting events. Gharavi films openly and conspicuously at all events he attends. For events that maintain formal media credentialing processes, Gharavi requests and receives credentials before recording. Gharavi selects thumbnail images for each video published on the Midwest Wrestle channel to accurately represent the content of the video.

17. Media access to collegiate and high school wrestling is not a standing entitlement. Where an event requires credentials, the host institution's athletic communications staff grants them one event at a time. Gharavi's Northwestern relationship exemplifies how that access is earned. It began in December 2021 with a credential application and was renewed by different Northwestern officials over three seasons, until his annual request for the Midlands had become a familiar exchange. From 2021 through 2023, Gharavi filmed at least thirty-five events. Since December 30, 2023, he has filmed three, the last on January 8, 2025. The answer was "No we had problems last year no photos," and when he asked what had happened, he received no explanation.

18. Officiating assignments are earned the same way. Before his first independent assignment, Gharavi studied the rulebook and case book, attended five clinics when one was required, and served as an unpaid assistant official at one tournament and two dual meets. From there he earned the confidence of the assigners and tournament directors who extend officiating assignments, and of the clinicians to whom he supplied training footage.

19. The Midwest Wrestle YouTube channel has grown to more than 187,000 subscribers and has accumulated over 145 million aggregate views.

20. Gharavi regularly monitors and moderates comments posted on Midwest Wrestle videos, including reviewing and translating comments submitted in foreign languages, and promptly removes comments that are inappropriate or harassing.

21. Gharavi has never purposely enabled YouTube's default "embedding" function on his videos for the purpose of allowing pornographic websites to display his content. That feature allows other websites to display his content by copying a line of code from YouTube into the HTML of another website. Gharavi has never authorized any pornographic or otherwise inappropriate website to access or display his videos in any manner.

22. As of June 5, 2023, Gharavi conducted an analysis of the top twenty-five most-viewed videos on the Midwest Wrestle YouTube channel. He determined that external sites embedding or linking to his YouTube videos made up approximately 0.79% of the total viewership of those videos. As of June 7, 2026, that figure stands at approximately 0.93%. The only external websites from which Gharavi was then aware that his videos had been accessed were standard and reputable sources such as the NCAA's official website and local wrestling club websites.

23. Gharavi has identified websites that have pirated or illegally redistributed copies of his videos without authorization. These websites steal Gharavi's content, and Gharavi actively and consistently pursues the removal of his content from such sites. Gharavi has never posted his videos to pornographic websites, has never encouraged anyone else to do so, and has no affiliation with any pornographic website.

24. Since May 2021, Gharavi has submitted approximately 350 DMCA takedown requests to hosting platforms to remove unauthorized copies of his videos. He has also initiated thirteen subpoena proceedings under 17 U.S.C. § 512(h), directed at platforms including Tumblr, Microsoft, Google, Reddit, Meta, X Corporation, and Dynadot, to identify the operators of

websites hosting his content without authorization. These actions reflect Gharavi's consistent effort to protect his copyrighted content and the athletes depicted in it.

25. Gharavi is the author and sole copyright owner of all original video content and photographs created for and published on the Midwest Wrestle YouTube channel. Gharavi has registered copyrights in a number of those works with the United States Copyright Office.

26. Over approximately eight years of operating Midwest Wrestle, Gharavi built a professional reputation in the wrestling community as a skilled and trustworthy media operator. He was regularly credentialed by major wrestling institutions, contracted by wrestling officiating organizations for assignment to tournaments and matches throughout Illinois and surrounding states, and recognized within the sport as a legitimate contributor to wrestling media. His work has been cited, embedded, and linked by credentialed media organizations, collegiate athletic programs, and officiating associations across the United States.

**B. <u>The National Wrestling Media Association and Jason Bryant</u>**

27. The National Wrestling Media Association is the national professional organization for journalists and media professionals who cover the sport of amateur wrestling. The NWMA's stated mission includes representing the interests of wrestling journalists, serving as a networking and information-sharing resource for its members, and supporting the growth of wrestling through quality media coverage. NWMA membership encompasses reporters, editors, publishers, photographers, broadcasters, athletic communications professionals, and other media professionals with involvement in the sport.

28. Although the NWMA does not itself issue media credentials, it functions as an influential voice within the wrestling media industry whose assessments of individual media operators carry significant weight with the institutions and event organizers that do. Institutions

and event organizers throughout the United States look to the NWMA and its leadership when deciding which media operators to credential and which to exclude. They look to it as well in characterizing the professional standing of individuals seeking access to their events and athletes. The NWMA's imprimatur—and the communications of its President acting in that capacity—carry institutional weight within the sport that the communications of an individual private citizen would not.

29. Defendant Jason Bryant served as President of the NWMA at all times relevant to this Complaint. Bryant's contact information—his personal cell phone number and personal email address—appeared on NWMA membership materials and official correspondence throughout his tenure, and he conducted NWMA business through those personal channels. Bryant resigned the NWMA presidency on December 4, 2025.

30. Bryant is also a wrestling media figure in his own right, operating under his personal brand and website at mattalkonline.com—previously operating under bryantwrestling.com—and maintaining a verified presence on X (@jasonmbryant). His dual role—as a verified individual voice in wrestling media and as the institutional leader of the NWMA—gave his communications about other wrestling media operators a compounded authority. Statements Bryant made were received not merely as the opinion of one wrestling journalist, but as the informed assessment of the individual responsible for setting professional standards for the wrestling media industry. Bryant's personal brand competed in the same arena as Midwest Wrestle.

31. Beginning no later than December 2021, Bryant used his position as NWMA President to conduct a campaign of institutional suppression against independent wrestling content creators. The campaign targeted their access to events, media credentials, and professional

relationships throughout the wrestling community. Bryant operated this campaign primarily through private back-channel communications directed at athletic directors, coaches, state high school athletic association officials, conference officials, and peer media organizations, deliberately avoiding public statements that could be attributed to him or challenged. Bryant has acknowledged in a private message that he was "extremely cautious with how I said things publicly about this topic," and that "most of my stuff was back channels and off the web conversations." *(See October 30, 2024 Bryant InterMat Private Message, attached as Exhibit 12)*.

32. Bryant conducted his back-channel campaign using the institutional resources and authority of the NWMA. His correspondence with athletic administrators and conference officials consistently identified him by his NWMA title and attached NWMA institutional context to his accusations. The NWMA accordingly bears direct institutional liability for the defamatory campaign Bryant conducted in its name and through its authority.

*33.* Bryant's awareness of litigation risk was established from the first day of the public campaign. On December 30, 2023, he publicly warned other participants in the defamatory forum thread that "the accused parties are ready and able to send their lawyers after you to shut you up." *(See Bryant InterMat Forum Posts, December 2023–January 2024, attached as Exhibit 8)*.

34. By October 30, 2024, that awareness had become an express personal expectation—Bryant privately told a third party that he was "surprised I haven't been" served with legal process, "given how close to the topic I have been." Exhibit 12.

35. Despite being aware that he would likely be named in litigation, throughout the entire period from December 30, 2023 through September 16, 2025, when a subpoena was served on him, Bryant kept his automatic tweet-deletion subscription and 30-day text message auto-deletion

policy running continuously. *(See Bryant TweetDelete Payment Records, 2024–2025, attached as Exhibit 13).*

### C. Bryant's Pattern of Conduct Against Competitors

36. The defamatory campaign Bryant and the NWMA conducted against Gharavi was not an isolated incident. It was at least the second iteration of a campaign Bryant had already executed against another wrestling content creator—Iowa-based wrestling photographer Cam Kramer—using the same institutional tools, the same back-channel approach, and leveraging the same NWMA authority. The Kramer campaign demonstrated from the outset that Bryant was willing to misrepresent the institutional basis for his advisories and to distribute them despite explicit legal guidance against it.

37. Beginning in December 2021, Bryant used his position as NWMA President to coordinate a campaign against Cam Kramer through the NWMA's advisory framework. Bryant contacted the Iowa High School Athletic Association ("IHSAA") through IHSAA Communications Director Chris Cuellar to obtain the contact information for Iowa high school athletic directors and wrestling coaches—a list covering 365 athletic directors across the state.

38. Before producing the contact list, IHSAA Communications Director Chris Cuellar wrote to Bryant on December 14, 2021 about the position of IHSAA's own legal counsel. Counsel had concluded that, without criminal or civil charges against Kramer, the IHSAA should not send out a statewide advisory notice on the issue. Bryant received the contact list two days later, on December 16, 2021, and proceeded with distribution anyway—issuing NWMA advisory notices targeting Kramer by name to all 365 Iowa athletic directors and wrestling coaches on the list. *(See IHSAA Subpoena Production, IHSAA000001–IHSAA000085, attached as Exhibit 3).*

39. Before distributing the advisory, Bryant assured Cuellar in writing that the NWMA "won't abuse the list and will issue this release to them strictly as an advisory." Bryant then distributed the advisory to all 365 athletic directors on the list, confirming the following day that he "didn't get a single auto-responder or bounce back." Exhibit 3.

40. The NWMA had published a public advisory against Kramer in November 2021; that advisory had not produced Kramer's removal from the industry. Bryant's personal distribution to 365 Iowa athletic directors did: Kramer was terminated from his employment with the wrestling media organization that had hired him. The outcome demonstrated what the public advisory alone had not achieved. Private back-channel pressure could reach individual decision-makers and remove a targeted media operator from the community before that person ever learned that accusations were being made against him, or had any opportunity to challenge them.

41. Bryant repeated the Kramer advisory distribution in January 2023. In distributing that advisory, Bryant falsely represented to each recipient that the IHSAA had provided their contact information "with the expressed purpose of sending this warning/advisory to all Iowa high schools." Exhibit 3. That characterization was false in its material implication. The IHSAA had told Bryant in December 2021 that, on its lawyers' advice, it would not issue a statewide notice of its own and would "continue to follow our legal counsel's recommendations regarding public comment at this time." By framing the IHSAA's provision of the list as an endorsement of the advisory's purpose, Bryant converted the IHSAA's reluctant cooperation into apparent institutional sanction—the opposite of what the IHSAA had specifically communicated. *(See Bryant Outreach Emails, 2021–2024, attached as Exhibit 4)*.

42. In later correspondence Bryant characterized the distribution as "a one-time (in this case, I guess annual) blast to notify schools"—a phrase that reveals the institutionalized, recurring

character of the campaign. Exhibits 3, 4. No new criminal charges, civil proceedings, or factual developments had emerged in the intervening year that would have provided a fresh basis for the advisory. Bryant had simply built annual redistribution into the operational rhythm of the NWMA's institutional suppression effort.

43. By January 2023, Bryant identified Gharavi and Midwest Wrestle as a second target. In that month, Bryant contacted Nick Whitley, Michigan State University's athletic communications contact for wrestling, suggesting that Gharavi's subscribers were not genuine wrestling fans. Bryant wrote that while Gharavi had "nearly 100K subscribers," he was "not sure it's because they're just wrestling fans." Exhibit 4. He also framed Gharavi's attendance at a prior MSU wrestling event as suspicious and potentially unauthorized. Bryant invoked the NWMA's ongoing campaign against Kramer as the established institutional template for how accusations of this kind were addressed in the wrestling media community.

44. Bryant made those statements in his opening email, before Whitley replied, while acknowledging that he had "never met the guy" and was relying on "word" that Gharavi "comes off a little sketch." Exhibit 4. On October 4, 2022—more than a month before the Michigan State wrestling event—Gharavi had in fact emailed Whitley directly, identified himself by name, and explicitly requested media access. Whitley replied the same day, confirmed that wrestling was a non-credentialing sport at Michigan State, and extended an explicit written invitation to attend. Gharavi's presence at the MSU event was not unauthorized—it was affirmatively welcomed in writing by the relevant Michigan State official. *(See October 4, 2022 Michigan State Media Access Emails, attached as Exhibit 5).*

### D. Gharavi's Northwestern Credentials and the Midlands Media Authorization

45. Gharavi's relationship with Northwestern University's athletic communications department as a credentialed wrestling media operator began in December 2021 and continued without interruption through December 2023. Over three consecutive years, Northwestern athletics approved Gharavi's media access to its wrestling events, including two consecutive Midlands Championships, through its standard institutional credentialing process. That relationship—established by multiple Northwestern officials across multiple credential cycles—was not the product of any ambiguity in Gharavi's status or any informality in his access. It was formal, institution-administered, and governed by the same process Northwestern applied to every other approved wrestling media operator.

46. The credentialing relationship was initiated in December 2021, when Northwestern Head Wrestling Coach Tim Cysewski emailed Gharavi a tournament schedule and thanked him for his support of Northwestern wrestling, and a Northwestern graduate assistant issued Gharavi a media credential application link. Northwestern subsequently approved Gharavi's media access to additional Northwestern wrestling events through 2022, with different officials approving each request through the department's established process. By December 2022, Ryan Haley, Northwestern's Assistant Director of Athletic Communications, had assumed primary responsibility for wrestling media credentialing. *(See Northwestern Media Credential Correspondence, 2021–2023, attached as Exhibit 1).*

47. For the 58th Annual Ken Kraft Midlands Championships in December 2022, Haley approved Gharavi's media credential and sent a mass approval email to all credentialed media. The 2022 mass approval email's recipient list included both Nima Gharavi and Cam Kramer by name—the same two individuals who would be ejected from the following year's Midlands

tournament. Both had been approved through Northwestern's institutional process in December 2022.

48. On December 4, 2023, Gharavi emailed Haley to request a media credential for the upcoming 59th Annual Ken Kraft Midlands Championships—noting, in a continuation of what had by then become a familiar annual exchange, that it was "difficult to believe a year has already gone by." Haley responded the following morning, December 5, 2023: "Happy to take care of you for Midlands. I'd plan on the same credential pickup/parking process as last year, but will confirm that when I send out an email to the full group of approvals closer to Christmas." That personal confirmation came twenty-four days before Gharavi's ejection. Exhibit 1.

49. Haley issued the formal mass approval email on December 26, 2023—three days before the tournament began and three days before Gharavi was ejected. That email, addressed to all approved 59th Midlands media, stated unambiguously: "If you are receiving this email, you have been approved for a media credential for the 59th Annual Ken Kraft Midlands Championships at NOW Arena in Hoffman Estates, Ill." The email included parking pass attachments, arena logistics, and a full two-day tournament schedule for the event Gharavi had been approved to cover. Exhibit 1.

50. Northwestern's official public media authorization document for the 59th Annual Ken Kraft Midlands Championships separately confirms that videographers constituted a recognized and credentialed category of media at the event. *(See Northwestern 2023 Midlands Championships Media Authorization, attached as Exhibit 2)* The unauthorized-filming narrative that Bryant would use to retroactively justify Gharavi's ejection has no factual basis. That narrative includes Bryant's post-hoc characterization, in a December 30, 2023 text message to Head Wrestling Coach Matt Storniolo, that "[t]he MW guy was easy, shooting video in an event where

BTN has the rights." *(See December 2023 Storniolo Text Messages, attached as Exhibit 6)* In reality, Gharavi was among the videographers who had been expressly approved to attend.

51. Ryan Haley personally confirmed Gharavi's credential on December 5, sent the formal mass approval on December 26, and was named on every approval email Gharavi received from Northwestern's credentialing department. Exhibit 1. He was the same official who physically retrieved Gharavi's media credential on the evening of December 29, 2023. At 9:15 PM that evening, Haley texted Storniolo: "Talked to Nima and got his credential. Thanks for the letting me know." Exhibit 6. The official who had approved Gharavi's attendance three days earlier retrieved his credential less than fifty minutes after Bryant's first defamatory private text message, sent at 8:26 PM and described in the next section, reached Storniolo. Exhibit 6. He did so without any independent assessment of the allegations Bryant had made, without disclosing to Gharavi the basis for the ejection, and without any institutional investigation of any kind.

**E. <u>December 29–31, 2023: The Catalyst Event and the Viral Campaign</u>**

52. The events of December 29–31, 2023 were the culmination of Bryant's private campaign against Gharavi and the ignition point for a public campaign whose defamatory posts drew more than one million views within a week. Bryant entered those three days as the architect of a back-channel suppression effort targeting Gharavi specifically that had been running in private for nearly a year. He triggered a viral firestorm while maintaining a public posture as a neutral observer.

53. On December 29, 2023, Bryant sent a series of private text messages to Storniolo, whose phone stored Bryant's contact under the pseudonym "Twink." Bryant's first message, sent at 8:26 PM, falsely accused Gharavi of sexual misconduct: "So apparently the MidwestWrestle perv is there too." Removing any ambiguity about whom he was referring to, he sent a secondhand

screenshot—transmitted to him by an unidentified third party who, by his own account, had "just screen shotted that one and sent it to me." The screenshot depicted Gharavi filming openly with a large professional video camera and stabilizing gimbal, the kind of conspicuous, professional apparatus used by credentialed broadcast and media operators at sporting events. The image Bryant offered as apparent evidence of suspicious conduct depicted the opposite: a media operator working openly and professionally in a credentialed environment. Exhibit 6.

54. In those messages, Bryant correctly identified Gharavi as "an Illinois HS official" and said that FloSports "came after him and can't seem to get him shut down either"—deploying both as institutional context for the false characterizations that followed: that Gharavi had "some real suspect content" and that "almost all of his thumbnails on his YouTube page are still of junk shots"—"That's not accidental either." Storniolo's replies at 9:02 and 9:03 PM reflected hesitation: he said he did not think Gharavi was "as bad as camkramer" and that while there were "some bad ones," there were also "a decent bit that don't look bad." Bryant's specific and false thumbnail characterizations overcame Storniolo's skepticism. Storniolo then deferred—"I trust you"—and the next night Bryant thanked him for "trusting my judgement." That movement from skepticism to deference, produced by Bryant's specific false claims, kept Storniolo from revisiting the ejection Bryant's first messages had already caused. Exhibit 6.

55. Bryant's initial characterization of Gharavi as a "perv"—combined with the secondhand screenshot Bryant transmitted—was the direct cause of Storniolo's decision to eject Gharavi from the tournament. Storniolo's first reply, at 8:28 PM, was a question: "That the guy in the photo?" Storniolo acted swiftly on Bryant's input. At 9:04 PM, thirty-eight minutes after Bryant's first message about Gharavi, he confirmed to Bryant that the ejection had already taken place: "Plus, it's too late. I already told him to f[*]ck off." Without Bryant's text messages,

Storniolo had no basis to identify Gharavi as a threat, no reason to approach him, and no cause to expel him. Bryant's subsequent false claims layered additional institutional justification onto an ejection Bryant had already caused. Those claims ensured that Storniolo would not second-guess the decision and that any institutional review would encounter a false factual rationale rather than the absence of one. Exhibit 6.

56. That same evening, Ryan Haley—the official who had personally confirmed Gharavi's credential twenty-four days earlier and issued the formal mass approval three days before the tournament—physically retrieved Gharavi's media credential. Haley confirmed to Storniolo that he had retrieved the credential. Exhibit 6.

57. Between the ejection on the evening of December 29 and Storniolo's messages to him beginning at 10:18 PM on December 30, Bryant notified Allyson Schwab and FloSports managing editor David Bray about the ejection. In those messages, Storniolo reported to Bryant that "Allison Schwab called me her new hero." Bryant had thereby completed the operational sequence his back-channel approach was designed to produce. A private text message to a single institutional decision-maker generated an institutional result—ejection and credential confiscation—that Bryant then relayed to parties positioned to broadcast that result publicly. Exhibit 6.

58. Bryant's actions led to a viral, public campaign that erupted on December 30, 2023. At 9:53 AM CST, Schwab published the first post—addressed to parents of youth wrestlers and ultimately reaching 377,800 views—characterizing unnamed wrestling content creators as individuals whose work attracted audiences with interests that went beyond the sport. The post urged parents to review whether their children appeared in online wrestling videos and encouraged schools and tournament directors to vet the credentials of those seeking to film athletes,

particularly minors. The post did not name Gharavi—it did not need to. It asked instead: "Is there 240k views on a jv match?" At the time, Midwest Wrestle had match videos with approximately 240,000 views. *(See December 30–31, 2023 X Posts, attached as Exhibit 7)*

59. At 10:21 AM CST, Christian Pyles, a FloSports content director, published a post—reaching 355,900 views—that established the accusatory framework into which Gharavi's identity would be publicly inserted less than three hours later. The post stated that FloSports had already "turned in" the Iowa subject to law enforcement and the NWMA and that he had been "let go by the wrestling media group who employed him." It then described a second subject: "There's one just as bad, if not worse who is scarily enough an official. Flo has done everything in power, leveraging partners, etc to get him out." The post accused both subjects of attracting an audience whose interest "eclipse[d] the most viewed sr level/NCAA matches in history" because of "twisted desires"—characterizing the high view counts on their videos not as evidence of popular legitimate content but as evidence of predatory viewership drawn by exploitative conduct. The "official" description—applied to someone who had just been ejected from the Midlands the previous day—was understood by the wrestling community as referring to Gharavi. Exhibit 7.

60. At 1:06 PM CST, a prominent wrestling media website operator published a post—reaching 125,600 views—that explicitly named both ejected individuals as a direct quotation of Pyles's post: "Both Cam Kramer (Iowa) and Nima Gharavi (Illinois / Midwest Wrestle) were kicked out of Midlands yesterday." The structure of this post is legally significant. Gharavi's name was inserted not as a standalone factual statement but as a caption embedded within a quotation of content describing individuals driven by "twisted desires" who attracted audiences of people who were not genuine wrestling fans. The naming post did not stand alone—it incorporated and extended the defamatory characterizations the preceding posts had established. By 1:06 PM CST

on December 30, 2023, Gharavi's full name, state of residence, and YouTube channel name had been publicly linked to conduct those posts had characterized as predatory and exploitative. Exhibit 7.

61. On December 31, 2023, Schwab published an additional post—reaching 261,400 views—that extended the campaign to anyone who had not yet encountered the direct naming: "Friendly reminder to check if your kids are on a certain YouTube channel. No reason a 46kg youth girls match should have 2.6 million views." At the time this post was published, Midwest Wrestle was the only YouTube channel with a video of a 46kg youth girls wrestling match at approximately 2.6 million views. This post identified Gharavi's channel to any parent who reviewed their child's YouTube appearances without Gharavi having been named—achieving identification through a unique empirical characteristic of his content rather than through any direct statement. Exhibit 7.

62. The four posts, published between the morning of December 30 and the afternoon of December 31, had collectively reached approximately 1.1 million views by January 4, 2024. The defamatory accusations they communicated were false. Those accusations were that Gharavi filmed minors for audiences with predatory intentions; that his extraordinary view counts reflected "twisted desires" rather than legitimate interest in the sport; and that he was a wrestling official continuing to work with children despite having been identified by national wrestling media organizations as a danger. They were also that his ejection from the Midlands was the deserved consequence of conduct that warranted both institutional action and public condemnation.

63. While the public campaign spread, Bryant participated in it from both his private concealment and his public positioning simultaneously. On December 30, Bryant posted in the InterMat forum thread that had been opened around the viral posts. In his first post, Bryant warned

other participants that "[w]hen you call someone out on things like this, the accused parties are ready and able to send their lawyers after you to shut you up." He delivered that warning while concealing his role as the campaign's architect. It functioned as preemptive inoculation against legal liability for the thread participants whose defamatory statements about Gharavi had been generated by Bryant's own private campaign. Exhibit 8. In a second post, responding to a participant who had offered a moderating perspective, Bryant wrote: "Nothing about this topic is about the quality of the video"—actively rejecting that perspective and endorsing the predatory framing. Exhibit 8.

### F. Bryant's Continuing Institutional Campaign

64. Within forty-eight hours of the ejection, Gharavi's credential confiscation had drawn Northwestern's own communications leadership into the orbit of Bryant's blacklisting apparatus. On December 30 and 31, 2023, Ryan Haley and Zachary Wingrove—Northwestern's Director of Public Relations and Digital Media—exchanged text messages reviewing the viral campaign and coordinating their institutional response. Wingrove shared with Haley the NWMA's published "do not credential" advisory for Cam Kramer, then forwarded the viral posts publicly naming both Kramer and Gharavi as the ejected individuals. On December 31, Haley committed: "Yep, I'm going to reach out to him after New Year's and ask for his 'do not credential' list, but the guys Pyles is referring to are quite clearly Cam and Nima." *(See Northwestern Subpoena Production, NU0001–NU0011, attached as Exhibit 11)* What the exchange establishes is that Bryant's private back-channel campaign had, within two days of the ejection, caused Northwestern athletics to actively consider adopting Bryant's blacklisting criteria as its own institutional standard.

65. On January 3–4, 2024, Bryant circulated an internal NWMA email to, upon information and belief, the NWMA's own board members. The recipients included Tony Rotundo, then serving as NWMA Treasurer; Richard Immel, Senior Manager of Communications at USAW; and KatieJo Svenson, then Sports Information Director at Wartburg College. The email discussed "some type of action" in response to the continuing situation and his intention to send his annual "Cam Advisory" again. That email contains a private admission: "The Midwest Wrestle guy was shown the door after he was asked if he was shooting video - the nefariousness associated with where his videos land and are viewed - didn't come up in that conversation, but the internet kinda took that and ran with it." That private admission exposes a deliberate gap between what Bryant told institutions and what he acknowledged internally. To athletic administrators across the country, Bryant presented the predatory-audience characterization as an established reason for the ejection. To his own board members, writing four days later, he acknowledged that characterization had nothing to do with what was actually said at the event. Bryant did not modify his institutional outreach upon making that acknowledgment. He continued to propagate the false characterization as settled fact. Exhibit 4.

66. On January 22, 2024, Bryant emailed Logan Young, Director of Sports Administration at the Big Ten Conference. Bryant noted in the email that Northwestern wrestling coach Matt Storniolo "sent me your direction on this"—identifying Storniolo as the institutional pathway through which Bryant accessed the conference. Bryant identified himself as NWMA President, cited his prior professional relationship with Northwestern, and proceeded to describe Gharavi to the Big Ten Conference in false and defamatory terms. Exhibit 4.

67. Bryant told the Big Ten Conference that "an individual named Nima Gharavi had his credential removed by tournament staff for shooting video of the event without authorization."

This was false. Gharavi had been formally credentialed by Northwestern's own credentialing department—documented in Exhibits 1 and 2—and his credential had been removed not because tournament staff found unauthorized filming but because Bryant's own private text messages to Storniolo had caused the ejection. Bryant was presenting to the Big Ten Conference an independent, institutional finding of unauthorized conduct—a finding that was, in fact, a direct consequence of his own defamatory communications. Bryant further stated that Gharavi was "marketing to a demographic who is uninterested in the sport of wrestling for the score, but for less than savory reasons" and that his video view counts—described as "astronomical compared to the sport's biggest stars and Olympic champions"—reflected the engagement of an audience with predatory interest in content featuring minors. These characterizations had no factual basis. Exhibit 4.

68. Bryant's Big Ten email was copied to David Bray of FloSports and to NWMA Treasurer Tony Rotundo. Bryant signed with his full NWMA presidential title, his National Wrestling Hall of Fame induction, and his sixteen wrestling journalism and broadcasting awards, and provided his personal cell phone number. That is the same number that appears across every NWMA institutional communication and every private back-channel message in the record. It underscores the absence of any meaningful separation between Bryant personally and the NWMA authority he invoked. The email was the NWMA and its allied media organizations leveraging coordinated institutional authority to seek suppression of Gharavi's channel from the premier collegiate athletic conference in the United States. Exhibit 4.

69. Young responded on January 23, 2024, that he had notified his office and would investigate what could be done. Bryant followed up on January 31—having continued to monitor Gharavi's YouTube channel in the weeks since the ejection—alerting Young that "there's been

several more videos from Midlands posted by the same MidwestWrestle account" and providing direct links. On February 1, Bryant pushed further: "If you guys don't control that content, who does?" Young replied that BTN and the conference's licensing agent were monitoring the channel for content falling under the Big Ten umbrella. Exhibit 4. Each communication Bryant made across this multi-institution, multi-year campaign—regardless of any individual institution's response—was an independent false and defamatory publication. Each damaged Gharavi's professional reputation with another audience of administrators and officials who held authority over his access to events, credentials, and opportunities.

70. Nearly one year after the Midlands ejection, Bryant returned to the IHSAA—now naming Midwest Wrestle directly alongside Cam Kramer in his annual distribution request. His December 4, 2024 email to Cuellar asked for updated contact lists for "a one-time (in this case, I guess annual) blast to notify schools." The request confirmed the deliberate, recurring character of the distribution program and its explicit expansion to target Gharavi's channel by name. The email also characterized the ongoing litigation in terms that were materially false, describing it as "a lawsuit against some of the fans who warned people about them." That description misrepresented both the identity of the parties being sued and the nature of the claims being asserted. Exhibit 4.

71. Cuellar's response to Bryant's December 2024 email constitutes a formal, documented institutional blacklisting of Midwest Wrestle: "We have not and will not credential Cam or Midwest Wrestle with our events." Exhibit 3. That statement—issued by the Communications Director of the athletic association governing high school sports throughout Iowa—is a direct, documented institutional consequence of Bryant's three-year campaign. That campaign began with Cam Kramer in December 2021, incorporated Gharavi by January 2023,

produced the Midlands ejection and viral firestorm in December 2023, and was still actively soliciting institutional buy-in as of December 2024, a full year after the original events.

**G. The *InterMat* Forum Thread**

72. The social media campaign that erupted on December 30, 2023 moved within hours to a second venue: the wrestling community's primary online forum, hosted at intermatwrestle.com. While the social media campaign reached a general audience measured in hundreds of thousands of views, the InterMat thread penetrated wrestling's institutional core—coaches, officials, athletic directors, and media members—through the community's most influential dedicated platform. The thread accumulated 179 replies across eight forum pages within approximately two weeks of opening. *(See InterMat Forum Thread, December 2023–January 2024, attached as Exhibit 9)* Unlike a social media post that recedes in an algorithmic feed, a searchable forum thread on wrestling's primary community site functions as a persistent, crawlable public record, continuously discoverable by anyone researching Gharavi's name in connection with the sport.

73. The thread also became a vehicle for calls to physical violence against Gharavi. John Davidson, posting under the handle Antitroll2828, wrote: "3 fathers or brothers in masks run into this guy throw him a beating, make him piss blood for awhile and see how many more tournaments this weirdo pops up after that," and separately: "If this guy was doing this in Nj I was would drive straight to the arena and wait for him in a parking lot, Violence has always been and always will be the greatest deterrent towards evil men." Exhibit 9. The thread also contains a post on January 3, 2024, that addressed Gharavi directly by name—"Hi Nima"—which received nine likes from the thread's audience before the authenticated PageVault capture was taken. Exhibit 9.

### H. Discovery of Bryant's Role

74. Plaintiff's counsel served a subpoena on Bryant and the NWMA in September 2025. Plaintiff's counsel also served a third-party subpoena on Storniolo. Storniolo cooperated promptly, and his counsel produced the subpoena response on October 24, 2025. *(See October–November 2025 Storniolo Subpoena Correspondence, attached as Exhibit 10)* Bryant's counsel later acknowledged that Bryant possessed no responsive text messages or direct messages, including any between himself and Storniolo. The reason given was that his ordinary practice was to automatically delete text messages older than thirty days.

75. The October 24, 2025 production contained text messages between Storniolo and a contact stored in his phone under the name "Twink." Those were the December 2023 communications in which Gharavi was characterized as a "perv" and a danger to the wrestling community, and in which Bryant confirmed he had notified Schwab and Bray of the ejection. The production established what had been said. It did not establish who "Twink" was. Bryant's pseudonym in Storniolo's contact list remained the final barrier to his identification.

76. On November 12, 2025, Plaintiff's counsel asked Storniolo's counsel to identify the individual saved in Storniolo's phone as "Twink" and to confirm the date of the messages. On November 13, 2025, Storniolo's counsel replied: "Twink is Jason Bryant and the date of the messages was December 2023." Exhibit 10. That confirmation—received by Plaintiff's counsel on November 13, 2025—is the operative date on which Bryant was established as the author of the defamatory communications that caused Gharavi's ejection and triggered the viral campaign. In June 2026, Storniolo's counsel supplemented the production with screenshots showing when the messages were sent. Exhibit 6.

77. Prior to November 13, 2025, there was no means by which Gharavi could have discovered Bryant's role through the exercise of reasonable diligence. Bryant's defamatory

communications were private, one-to-one messages transmitted through a personal device to a single recipient. They were not published, not publicly attributed, not memorialized in any document available to Gharavi, and not connected to Bryant's public persona in any way that could have surfaced through investigation of the public record. Nothing in the publicly available record disclosed the existence, the content, or the recipients of Bryant's private communications about Gharavi, or connected Bryant to the ejection. To any person without access to Bryant's private communications, the ejection appeared to be the independent judgment of a Northwestern coach acting on his own authority, and the viral campaign appeared to have originated with Schwab and Pyles.

78. Bryant's institutional communications about Gharavi were equally private. His January 2023 email to Michigan State University, his January 3–4, 2024 email to NWMA officers, and his January 22 through February 1, 2024 emails to the Big Ten Conference were disclosed for the first time in Bryant's subpoena production of February 18, 2026. Exhibit 4. Bryant's counsel transmitted that production by email the same day. *(See February 18, 2026 Bryant Production Transmittal Email, attached as Exhibit 14)* His December 4, 2024 email to the IHSAA naming Midwest Wrestle, and the IHSAA's December 6, 2024 response that it would not credential Midwest Wrestle, were disclosed in two productions. Bryant produced them on February 18, 2026, and the IHSAA's subpoena production, received on May 20, 2026, contains them as well. Exhibits 3, 4.

## <u>COUNT I—DEFAMATION *PER SE*</u>

*(Against Bryant and the NWMA)*

79. Plaintiffs incorporate by reference paragraphs 1 through 78 as if fully set forth herein.

80. Between January 2023 and December 2024, Bryant and the NWMA published numerous false statements of fact identifying Gharavi by name, by his channel, or by photograph. Those statements characterized him as a predatory figure who filmed minor athletes for audiences with prurient intentions, whose videos were distributed on pornographic websites, and whose presence at wrestling events posed a danger to the athletes and community he served. These publications reached athletic directors, wrestling coaches, conference officials, state athletic associations, collegiate programs, and peer media organizations throughout the United States. They traveled through Bryant's text messages to Storniolo, Bryant's institutional outreach emails, and NWMA mass distributions to hundreds of Iowa school officials. Exhibits 3, 4, 6.

81. Each of these statements was false. Gharavi is not a predator, has never filmed minor athletes for prurient audiences, has never distributed his content to pornographic websites, and has never posed any danger to the wrestling community. At the time of each publication, Bryant and the NWMA either knew the statements were false or made them with reckless disregard for their truth or falsity. Bryant possessed no supporting evidence, received no criminal complaint, and observed no misconduct firsthand. His own private communications reveal that he acknowledged the predatory narrative had not arisen from the events he cited as its basis and that he deliberately chose back channels to avoid public accountability for his accusations.

82. Bryant's and the NWMA's statements are defamatory *per se* under Illinois law. They impute the commission of criminal offenses involving the sexual exploitation of minor athletes. They impute an inability to perform and a want of integrity in the discharge of Gharavi's duties as a licensed wrestling official. They prejudice Gharavi in his profession and business as a credentialed wrestling media operator. Under Illinois law, harm is presumed from statements defamatory *per se*.

83. Bryant conducted the defamatory campaign in his capacity as NWMA President. He used the NWMA's institutional authority, official correspondence, and recognized position as the national professional organization for wrestling media to lend credibility to accusations that would not have produced institutional action from a private individual. The NWMA bears direct institutional liability for the campaign Bryant conducted in its name and is vicariously liable for Bryant's conduct as its agent.

84. Plaintiffs' defamation claims against Bryant and the NWMA are timely. As set forth in paragraphs 74 through 78, each of the communications on which this Count rests was private and undiscoverable until it was produced by a third party or by Bryant himself. The December 29–30, 2023 text messages were produced on October 24, 2025, and attributed to Bryant on November 13, 2025. Bryant's institutional emails were first disclosed in the subpoena productions described in paragraph 78. This action is filed within one year of November 13, 2025, and within one year of February 18, 2026.

85. As a direct and proximate result of Bryant's and the NWMA's defamatory conduct, Plaintiffs have suffered damages. Those damages include the revocation of Gharavi's media credential at the 2023 Midlands Championships and the end of his annual access to the event; cancellation of officiating contracts with the IHSA, IESA, and NCAA; formal institutional blacklisting by the IHSAA; and loss of the USAW tournament officiating relationship. They also include severe harm to Gharavi's professional reputation throughout the wrestling community and harm to the business value, revenue, and community engagement of the Midwest Wrestle channel and RCO. The training clips Gharavi supplied to officiating clinicians fell from 256 in 2023 to 38 in 2024 and 18 in 2025. Bryant's and the NWMA's conduct was willful and malicious. It subjected Gharavi to public threats of physical violence—including explicit calls for him to be beaten—and

forced him to temporarily vacate his home for his physical safety after an attempted break-in. Plaintiffs seek compensatory damages, punitive damages, and all other relief the Court deems just and proper.

## COUNT II—DEFAMATION *PER QUOD*

*(In the Alternative to Count I)*

*(Against Bryant and the NWMA)*

86. Plaintiffs incorporate by reference paragraphs 1 through 85 as if fully set forth herein.

87. This Count is pleaded in the alternative to Count I. To the extent any of the statements described in Count I is found to require extrinsic facts to establish its defamatory meaning, that statement was defamatory *per quod*. The recipients knew the NWMA's advisory campaign against Cam Kramer, which Bryant invoked as the template for his accusations against Gharavi, and they received Bryant's characterization of Gharavi's audience as drawn by "less than savory reasons." Exhibit 4. Read with those facts, the statements communicated to athletic administrators, coaches, and conference officials that Gharavi filmed minor athletes for a prurient audience and posed a danger to the athletes he filmed and officiated.

88. Each of these statements was false. Bryant and the NWMA published them with knowledge of their falsity or with reckless disregard for their truth, for the reasons set forth in paragraph 81.

89. As a direct and proximate result of these publications, Plaintiffs suffered specific pecuniary losses:

(a) Gharavi's media credential for the 59th Annual Ken Kraft Midlands Championships was revoked, and he has not been able to return to that event since.

(b) Gharavi's officiating contracts with the IHSA, the IESA, and the NCAA were cancelled or not renewed, with the loss of the officiating fees those contracts provided. On January 1, 2024, a coach wrote to the Illinois Wrestling Coaches and Officials Association ("IWCOA") that Gharavi "was removed from Midlands due to their conduct" and asked it to investigate. At 5:08 PM on January 2, the IWCOA replied that it was "looking into this matter" and knew "others/other organizations are as well." That evening, a removal notice arrived, and by January 5, Gharavi had been removed from thirteen high school matches to which he had been assigned for that month. On January 9, he was removed from two college events scheduled for January 20 and February 8, 2024. He was assigned to the IESA postseason and then removed, and he was dropped from the IHSA postseason.

(c) Gharavi lost the USAW officiating assignment for the Brian Keck Memorial Preseason Nationals & Boys National Recruiting Showcase. He had officiated the event in 2022 and 2023 and remained on the head official's email distributions to officials through December 15, 2023. He was left off the 2024 roster for the paid event, although it expanded to forty-two mat officials. Two written inquiries to the head official in September 2024 went unanswered.

(d) Bryant's December 4, 2024 email to the IHSAA falsely linked Midwest Wrestle to Kramer. The IHSAA replied: "We have not and will not credential Cam or Midwest Wrestle with our events." Exhibit 3. That bar forecloses a source of content and revenue for Midwest Wrestle.

90. Plaintiffs seek compensatory damages, including special damages, punitive damages, and all other relief the Court deems just and proper.

## COUNT III—TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

*(Against Bryant and the NWMA)*

91. Plaintiffs incorporate by reference paragraphs 1 through 90 as if fully set forth herein.

92. At all relevant times, Gharavi and RCO were parties to valid and enforceable officiating contracts with the IHSA, IESA, and NCAA. Under those contracts Gharavi was assigned to officiate wrestling matches at events organized by those bodies and was compensated for such assignments. Bryant and the NWMA were aware of Gharavi's officiating contracts; Bryant explicitly identified Gharavi as "an Illinois HS official" in his defamatory communications to Storniolo and characterized Gharavi's official status as a factor making him particularly dangerous. Exhibit 6.

93. Bryant and the NWMA intentionally and unjustifiably induced breach of Gharavi's and RCO's officiating contracts by disseminating defamatory accusations characterizing Gharavi as a predatory presence at wrestling events. Those accusations, if credited by the institutions that employed him, would cause and did cause those institutions to terminate the officiating relationships. Bryant and the NWMA's interference was not privileged; their statements were false and made without factual basis or legitimate justification.

94. As a direct result of Bryant's and the NWMA's interference, the IHSA, IESA, and NCAA, through schools and assignors, cancelled or declined to renew the officiating contracts under which Gharavi had been assigned to officiate.

95. As a direct and proximate result of that interference, Plaintiffs have suffered damages including lost officiating income, lost professional opportunities, and harm to Gharavi's standing as a licensed official. Bryant's and the NWMA's conduct was willful and malicious.

Plaintiffs seek compensatory damages, punitive damages, and all other relief the Court deems just and proper.

## COUNT IV—TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

*(Against Bryant and the NWMA)*

96. Plaintiffs incorporate by reference paragraphs 1 through 95 as if fully set forth herein.

97. Gharavi and RCO had a reasonable expectation of continuing and expanding three business relationships and opportunities. The first was media credential access to collegiate and high school wrestling events necessary for the production of Midwest Wrestle content. The second was officiating assignments from USAW for the Brian Keck Memorial Preseason Nationals & Boys National Recruiting Showcase, for which Gharavi had officiated in each of the two preceding years. The third was the continued growth of the Midwest Wrestle channel's subscriber base, viewership, and advertising revenue.

98. Bryant and the NWMA were aware of Gharavi's credential-dependent media business, his officiating relationships, and his channel's growth trajectory. Bryant explicitly referenced Gharavi's channel, its view counts, and his officiating credentials in multiple institutional communications directed at parties with authority over those very relationships. Exhibits 3, 4, 6.

99. Bryant and the NWMA intentionally and unjustifiably interfered with these business expectancies by disseminating defamatory accusations. Those accusations caused event organizers and athletic administrators to deny Gharavi credential access, to exclude his channel from institutional association, and to terminate the working relationship under which USAW had contracted his officiating services. Bryant's January 3–4, 2024 email reached USAW's Senior

Manager of Communications, and Gharavi was excluded from the 2024 officiating roster. Their interference was unjustified; the accusations underlying each institutional communication were false, made without evidentiary basis, and carried out through deliberately concealed back channels to avoid accountability.

100. As a direct and proximate result, Gharavi has been denied credentials at events necessary for Midwest Wrestle's operation, excluded from the USAW tournament officiating relationship, and prevented from realizing the business opportunities those relationships represented. Plaintiffs seek compensatory damages, punitive damages, and all other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Nima Gharavi and Right Call Officials, Inc. respectfully request that the Court enter judgment in their favor and against Defendants as follows:

(a) Against Defendants Bryant and the National Wrestling Media Association on Count I (Defamation *Per Se*): compensatory damages in amounts to be proven at trial, including damages for the revocation of Gharavi's media credentials, cancellation of officiating contracts, institutional blacklisting, loss of the USAW tournament officiating relationship, harm to Gharavi's professional reputation throughout the wrestling community, harm to the business value and revenue of Midwest Wrestle and RCO, and the harm to Gharavi's physical safety and personal wellbeing caused by the threats and harassment Defendants' conduct produced;

(b) In the alternative to the relief requested under Count I, against Defendants Bryant and the National Wrestling Media Association on Count II (Defamation *Per Quod*): compensatory damages, including special damages, and punitive damages, in amounts to be proven at trial;

(c) Against Defendants Bryant and the National Wrestling Media Association on Counts III and IV (Tortious Interference with Contractual Relations and Tortious Interference with Prospective Economic Advantage): compensatory damages in amounts to be proven at trial;

(d) Against Defendants Bryant and the National Wrestling Media Association on Counts I, III, and IV: punitive damages in amounts sufficient to punish Defendants for their willful and malicious conduct and to deter similar conduct in the future;

(e) Pre-judgment and post-judgment interest at the maximum rate permitted by law;

(f) Costs of suit; and

(g) Such other and further relief as the Court deems just and proper.

**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully Submitted,

**NIMA GHARAVI and RIGHT CALL OFFICIALS, INC.**

Dated: October 23, 2026

By: *<u>/s/ William D. Patterson</u>*

William D. Patterson (ARDC #6294533)
Nicole O'Toole Peterson (ARDC #6330227)
Olivia E. Duggins (#6349003)
SWANSON, MARTIN & BELL, LLP
330 N. Wabash Avenue, Suite 3300
Chicago, Illinois 60611
Phone: (312) 321-9100
wpatterson@smbtrials.com
jbecker@smbtrials.com
npeterson@smbtrials.com
oduggins@smbtrials.com